Filed 12/2/25  P. v. Walker CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B324921 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA090187) |
| v. | |
| KAALAN WALKER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Joseph A. Brandolino, Judge.  Affirmed as modified.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jonathan Kline and Kristen J. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Kaalan Walker appeals from his judgment of conviction of sexual offenses against multiple victims, many of whom were young, aspiring models that Walker offered to photograph. On appeal, Walker argues: (1) the trial court erred in overruling a defense objection to the prosecutor's exercise of a peremptory challenge against a Black juror; (2) the trial court erred in admitting evidence of Walker's online search history; (3) the trial court erred in excluding proffered impeachment evidence; (4) the trial court erred in excluding proffered character evidence; (5) there was cumulative error; and (6) this court should conduct an independent review of sealed transcripts for any discoverable material under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). Walker also asserts there are certain clerical errors in the abstract of judgment. We conclude Walker has failed to show any error requiring the reversal of his convictions. We modify the abstract of judgment to correct the clerical errors identified by Walker, and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Charges

In an amended information, Walker was charged with six counts of forcible rape (Pen. Code[1] § 261, subd. (a)(2); counts 1, 3, 5, 8, 11, & 15), two counts of unlawful sexual intercourse with a minor more than three years younger (§ 261.5, subd. (c); counts 2 & 10), one count of sexual penetration by force (§ 289, subd. (a)(1)(A); count 18), one count of contact with a minor for a sexual offense (§ 288.3, subd. (a); count 22), two counts of rape

---

[1] Unless otherwise stated, all further undesignated statutory references are to the Penal Code.

2

while the victim was intoxicated (§ 261, subd. (a)(3); counts 23 & 25), and one count of assault with intent to commit a sexual offense (§ 220, subd. (a)(1); count 24). As to seven of the counts, it was alleged that the acts were committed against multiple victims. (§ 667.61, subd. (b) & (e).) The information also alleged numerous aggravating factors (Cal. Rules of Court, rule 4.421(a) & (c)).

## 2. Prosecution evidence

### 2.1. Forcible rape of minor M.C. (count 1)

In 2013, when M.C. was 16 years old, she received a direct message from Walker on Twitter. Walker's Twitter account indicated that he was a music artist, which M.C. believed was legitimate because the account was verified with a blue check mark. Walker offered M.C. $5,000 to appear in a music video, and M.C. agreed to meet with him in person to discuss the offer.

Prior to the meeting, Walker asked M.C. her age. M.C. told him that she was a minor, in high school, and did not drive. At Walker's direction, M.C. took a train to downtown Los Angeles, and he picked her up from the station in his car. While M.C. was in the car, Walker bragged about himself and celebrities with whom he had worked. Walker drove M.C. to an apartment building, and then took her upstairs to a closed lounge area.

Once inside the lounge, Walker told M.C. that he took massage classes and wanted to show her some things that he learned. M.C. was uncomfortable but agreed to a massage. While M.C. was lying on her stomach, Walker sat on top of her and began massaging her back. When Walker moved his hands toward her lower body, M.C. repeatedly asked him what he was doing. She also said "No," and tried to turn. Walker continued touching M.C.'s buttocks and vaginal area. Walker then forcibly

3

pulled down M.C.'s pants, and inserted his penis inside her vagina.  M.C. began to cry and shake with fear.  At some point, Walker stopped.  M.C. told Walker that she wanted to leave, and he drove her to a train station.

M.C. initially did not report the incident because she felt ashamed that she lied to her parents about where she was going.  In 2018, M.C. saw Walker at a club and decided to confront him, but she lost him in the crowd.  M.C. later told her cousin what happened, and her cousin sent her a news article about Walker.  After reading the article, M.C. disclosed the assault to her parents and then reported it to the police.

### 2.2.  Unlawful sexual intercourse with minor Aliyah G. (count 2)

In 2017, Aliyah G. was 16 years old and an aspiring model.  She began following Walker's Instagram account after she came across photos that he took of another model.  Based on Walker's Instagram posts, Aliyah believed he was a professional photographer.  At some point, Walker sent Aliyah a direct message on Instagram, asking if she wanted to do a photo shoot.  Aliyah agreed.  Prior to meeting Walker, Aliyah told him she was 16 years old.

On the day of the photo shoot, Walker arranged for an Uber to bring Aliyah to his apartment complex.  Aliyah asked her friend, Camille, to accompany her to the shoot.  When the girls arrived, Walker took them to a recreational area near a pool.  He told Aliyah that they would go to his apartment for the photo shoot, but her friend had to stay in the recreational area.  Walker then brought Aliyah to his apartment, where he took photos of her for about 30 minutes.

4

After the photo shoot, Walker told Aliyah that he wanted to talk to her inside his bedroom.  He claimed that he knew Drake and other celebrities, and that he would take her to a party where she could network with them.  Walker asked Aliyah about her sexual experience, and she told him that she was a virgin. Walker explained that the people at the party would not like someone who lacked sexual experience, and repeatedly asked Aliyah if she wanted him to "pop [her] cherry."  Although Aliyah told Walker "no" at least five times, he persisted in asking her. Aliyah eventually agreed to have sex with Walker because she "didn't know what else to do."

After Aliyah undressed, Walker said that he was going to record them having sex with his phone, and she agreed.  At Walker's direction, Aliyah orally copulated him, and he then penetrated her vagina with his penis.  Afterward, Aliyah returned to the recreational area, and told Camille that she had sex with Walker.

A year later, Aliyah disclosed the incident to her mother. She then went to a Planned Parenthood clinic and told a nurse that she had nonconsensual sex with an older man.  Aliyah described the sex as nonconsensual at that time because she repeatedly said "no" to Walker and only "gave in" after he continued to pressure her.  Aliyah later reported the incident to the police.

After Aliyah testified at the preliminary hearing, the video that Walker recorded of their sexual activity was posted on a social media platform.  In the video, Aliyah is seen smiling and giggling.  At trial, Aliyah testified that she had consensual sex with Walker, but she also felt that he "preyed on" her in a "premeditated" way.

5

### 2.3. Unlawful sexual intercourse with minor Gianna R. (count 10)

In 2017, Gianna R. was 16 years old and a child actor. She was interested in expanding her career into modeling. Gianna first heard from Walker when he sent her a direct message on Instagram, asking if she wanted to do a photo shoot. She assumed he was a legitimate photographer because his account was verified with a blue check mark. Gianna agreed to the shoot. She told Walker that she was 16 years old, and wanted professional headshots.

On the day of the photo shoot, Gianna went to Walker's apartment complex with her family. When they arrived, Walker brought them to a common area near the pool. Gianna's mother told Walker that Gianna had just turned 16, and was interested in modeling for major brands such as Vogue and Victoria's Secret. Walker pointed out that those magazines had a minimum age requirement so Gianna would have to wait until she turned 18 to submit photos to them. Walker also bragged about his own success in Hollywood and the celebrities that he knew, including Halle Barry and Drake.

At Walker's direction, Gianna's family waited outside by the pool while he took headshots of Gianna in the common area. As the shoot progressed, Walker told Gianna that she would have to take more revealing photos if she wanted to model for Vogue or Victoria's Secret. Although Gianna was uncomfortable, she agreed to pose for some photos in her bra and underwear. Walker then said that if Gianna wanted to be successful in the industry and to meet his friend Drake, she would have to film a sex video. Gianna repeatedly declined Walker's offer, but when he continued to push the issue, she agreed.

Walker told Gianna's family that he was going to take her to the other side of the building for additional photos. He instead brought Gianna to his apartment, which had a mattress on the floor in the living room. Walker directed Gianna to record them with his phone and remove her clothing. Walker then penetrated her vagina with his penis. Afterward, Walker told Gianna not to tell anyone that they had sex. He also said that he would be sending the video to Drake, which would make Gianna famous. Walker accompanied Gianna back to the pool area, and she left with her family. Gianna did not tell anyone at that time what occurred.

A few months later, Walker called Gianna and told her that he was backstage at a Drake concert, and asked her to come and meet him. Gianna did not believe Walker, and blocked his phone number to avoid further contact. The following year, Gianna disclosed to her mother what happened with Walker. Her mother then took Gianna to the police to report the incident.

### 2.4. Forcible rape and rape while the victim was intoxicated of Kimberly Q. (counts 11 and 23)

In 2017, Kimberly Q. was 18 years old and working as a model while attending college in New York. She received a direct message from Walker on Instagram, asking if she was interested in a photo shoot. He offered her a rate of $200 per hour for a six-hour shoot to take place in Los Angeles. He also offered to reserve a hotel room for her and to reimburse her for the cost of her flight. Based on Walker's Instagram profile, which was verified with a blue check mark, Kimberly believed he was a professional photographer. After communicating with Walker for a few weeks, Kimberly agreed to a date for the photo shoot.

7

When Kimberly arrived in Los Angeles, she took a Lyft to Walker's apartment complex. After Walker brought Kimberly into his apartment, he repeatedly offered her alcohol and told her that it would help her feel more confident. Kimberly was uncomfortable because she never had alcohol before, but she agreed and proceeded to drink three glasses of hard liquor. At Walker's request, Kimberly also agreed to pose for photos in her bra and underwear. Kimberly then changed into another outfit, and Walker continued to photograph her in an area outside the apartment complex.

At some point during the photo shoot, Kimberly began to feel unbalanced and collapsed to the floor due to the alcohol she consumed. Walker helped Kimberly up, guided her back to his apartment, and placed her on his bed. Kimberly blacked out, and when she woke up, her body felt paralyzed and her pants had been removed. Walker then removed Kimberly's underwear and penetrated her vagina with his penis. Kimberly repeatedly told Walker to stop, but he refused.

After the assault, Kimberly continued to fall in and out of consciousness. When she woke up again, she checked her phone and saw that a message had been posted from her Instagram account, recommending that others follow Walker's account. Kimberly did not write that post. Later, Walker took Kimberly's phone and replied to text messages that she received from friends checking in on her. After Walker returned the phone to her, Kimberly texted a friend, "I think I just got raped. Just save this conversation. . . . [¶] . . . [¶] He's looking at my phone so just save all of this for me."

The next morning, Kimberly pretended that she had no memory of the assault so that Walker would allow her to leave.

8

After she returned to New York, Kimberly went to the hospital and disclosed to the staff there that she was raped while under the influence of alcohol. At that time, she submitted to a sexual assault forensic exam. A few weeks later, Kimberly reported the rape to the police. Prior to making the police report, she asked Walker to reimburse her for her plane ticket, but he did not do so. Kimberly also told Walker in a text message that she "remember[ed] everything," and that he "took advantage" of her while she was drunk.

### 2.5. Forcible rape of Paris L. (count 15)

In 2016, Paris L. was 21 years old and working as a model. She received a direct message from Walker on Instagram, asking to book her for a magazine photo shoot. Paris believed the request was legitimate because Walker had a large Instagram following and his account was verified with a blue check mark. Walker told Paris the payment for the photo shoot would be $3,000, but did not provide other details. He asked to meet in person to discuss the shoot, and Paris agreed to the meeting.

When Paris arrived at Walker's apartment complex, he told her that he did not want to discuss business in public, and then took her to his apartment. Once inside the apartment, Walker showed Paris photos of other models, and said that these women maintain a luxurious lifestyle by having sex with famous rappers. He also said that the rapper, Drake, wanted to pay her $95,000 to serve as an escort for him, with Walker receiving a percentage of that fee. Paris declined the offer.

Later in the conversation, Walker told Paris that he wanted to see what her body looked like to confirm if she was the right fit for the photo shoot. After removing her dress in the bathroom, Paris went to the living room in her bra and

underwear. Walker told Paris to lie on the mattress so that he could give her a massage. Paris replied that she did not "want to do anything" and needed to leave soon. Walker was persistent, however, and Paris felt that she had to comply. Once Paris was face down on the mattress, Walker began to massage her. Paris repeatedly told Walker that she did not want to have sex with him. She also tried to move away, but Walker pinned her down with his body. Walker moved Paris's underwear to the side, and after putting on a condom, he penetrated her vagina with his penis. Paris told Walker to stop, but he refused. At one point, Walker dumped money on top of Paris. He then said, "The longer you comply, the more money you're going to get. Anything that touches the floor, you can keep." Paris told Walker that she did not want his money.

After the assault, Walker put some money in Paris's purse. She again said that she did not want his money, and that she was not a prostitute. In response, Walker told Paris, " 'You're not a prostitute. Prostitutes fuck all kinds of men. You only fuck a few.' " He added, " 'I shouldn't have to worry about you; you should worry about me.' " As soon as Paris got to her car, she called her friend and told her that she had been raped.

The following day, Paris stated in a text message to Walker that she told him to stop many times and that he did not do so. Walker replied that Paris was indecisive so he was not sure what she wanted, and that he apologized if he disrespected her. Later that day, Paris reported the incident to the police.

### 2.6. Assault of Isabel I. (count 24)

In 2018, Isabel I. moved to Los Angeles to pursue a career as a singer/songwriter. She was living with her new boyfriend, Jordan, who was Walker's photographer and friend. Isabel knew

10

Walker was a recording artist, rapper, and actor. In July 2018, Isabel received a call from Walker on Jordan's phone. Walker said that he heard one of her songs and liked her voice, and invited her to the studio in his apartment to record some music. Isabel agreed.

When Isabel arrived at the apartment complex, Jordan brought her upstairs to Walker's unit and then left in her car to go to a photo shoot. After Jordan left, Walker asked Isabel about her Instagram account, and told her that she needed to sexualize her image to succeed in the music industry. He also talked about well-known female artists whom he claimed became famous by performing sexual acts. Walker said that he knew Isabel was a sexual person because he saw videos of her on Jordan's phone. He suggested that he could help her with her music career if she agreed to have sex with him. Walker then became more direct, and repeatedly asked Isabel to perform oral sex on him for money. Isabel told Walker that she was not interested.

At some point, Walker pushed Isabel onto the bed and began masturbating over her. He briefly left the room when he received a call from Jordan, ordering Isabel in an aggressive tone not to move. Isabel complied because she was afraid and suspected that the situation was a setup arranged by Jordan. When Walker returned, he forced Isabel to orally copulate him until he ejaculated in her mouth.

Afterward, as Isabel was leaving the apartment, Walker followed her and said, "Jordan's loyalty lies with me." Isabel went downstairs where Jordan was waiting in her car. While driving home with Jordan, Isabel began to cry and told him that Walker was not his friend. She did not disclose the assault to Jordan at that time because she was afraid that he was involved.

The next day, Isabel had a painful swollen throat, and believed that Walker had given her a sexually transmitted disease. At that point, she told Jordan what happened. Isabel then went to the emergency room where she disclosed the assault to the hospital staff and received treatment for gonorrhea. Isabel later reported the assault to the police.

### 2.7. Rape while the victim was intoxicated of Desiree B. (count 25)

In 2014, when Desiree B. was 18 years old, she went to a nightclub in downtown Los Angeles. Desiree was part of a group that took a party bus to the nightclub, and she drank a lot of alcohol while on the bus. By the time she arrived at the nightclub, she was very drunk and security refused to allow her inside. While the rest of the group went inside the nightclub, Desiree remained outside on her own.

At some point, a young Black man approached and offered to help Desiree get into the nightclub through a back area. Desiree was still drunk at the time, and agreed to go with the man. He instead led her to an outdoor parking lot where she ended up in the back seat of a car. The man also got into the car and was suddenly on top of Desiree, forcing her on her back. Scared and confused, Desiree told the man to stop and tried to push him away. The man held Desiree down, and then penetrated her vagina with his penis.

After the assault, Desiree got out of the car and went back to the party bus. She did not tell anyone on the bus what happened to her. The next morning, Desiree was in a lot of pain and discovered a cyst in her vaginal area that she did not have prior to the assault. A few days later, she visited a Planned Parenthood clinic and disclosed the assault to a nurse who then

reported it to the police. Desiree submitted to a sexual assault forensic exam, which revealed vaginal bruising and redness. She also provided the police with the dress that she was wearing when the assault occurred.

Several years later, in 2018, a detective contacted Desiree and informed her that there was a match to the DNA collected from her sexual assault exam. At that time, Desiree was shown a photographic lineup, and she selected Walker as her possible assailant because he was the youngest person in the photos. Desiree did not recognize Walker at trial and did not recall seeing him before. She testified that she could not remember the details of the assault because she was intoxicated and was "blacking out a lot" when it occurred.

### 2.8. Prior uncharged offenses

The prosecution presented evidence of three uncharged sexual offenses committed by Walker. Jamie H. testified that, in 2015, she met Walker backstage at a music concert, and that he invited her to an afterparty to meet one of the performers. Walker instead took Jamie to an empty apartment where he held her against her will and raped her. Dalia S. testified that, in 2014, she and a friend socialized with Walker at a party in the apartment complex where she lived, and that Walker later drove them to a convenience store. After dropping off Dalia's friend, Walker drove his car to a parking lot, locked the rear doors, and then raped Dalia in the back seat. Jada E. testified that, in 2016, she was 17 years old and an aspiring model, and that Walker contacted her on Instagram about a photo shoot. While Jada was at Walker's apartment for the scheduled shoot, he started to massage and sexually molest her, and told her she needed to

13

perform sexual acts to succeed as a model. When Jada began to cry and begged him to stop, Walker raped her.

### 2.9. Police investigation

In 2017, Los Angeles police detective Karen Widman was assigned to investigate the sexual assault report that Kimberly made against Walker. During that investigation, Detective Widman learned of the reports made by three other complainants, including Isabel and Paris. Walker was first arrested on September 11, 2018, and provided a DNA sample at that time. In October 2018, the police issued a press release announcing that Walker was under investigation for a series of sexual assaults and requesting that the public contact a tip line with any relevant information. As a result of the press release, Detective Widman was contacted by a number of other complainants, including M.C., Aliyah, Gianna, Jamie, Dalia, and Jada.

In late 2018, Detective Widman learned that there was a DNA match to Walker for the 2014 sexual assault reported by Desiree. Walker's DNA also matched the DNA recovered in the sexual assault exams performed on Kimberly and Jamie. Walker was arrested a second time on March 25, 2019.

During the investigation, the police searched two apartments associated with Walker, and seized a computer and multiple cell phones. Data extracted from Walker's computer showed that, in April 2018, he visited a pornography website and searched for "raped" videos. Walker also visited that same pornography website on two of his cell phones. He searched the website for "fucking this girl from Instagram" videos in August 2018 and "tricked into f'g" videos in September 2018 prior to his first arrest. He again searched the website in March 2019 prior

to his second arrest for videos on "exploited girl talked into sex with pervert photographer," "rape," "begged not to rape," and "fake photo shoot."

### 3. Defense evidence

Walker testified at trial on his own behalf. According to his testimony, Walker was born in 1995, and was a dancer, musician, actor, and photographer. In 2018, he had roles in two movies, including one starring Halle Berry. Walker's Instagram and Twitter accounts were verified with blue check marks because he was considered a "person of influence" at the time. Walker either resided at or had access to the apartment complexes where the alleged crimes took place.

Walker admitted that he contacted several of his accusers, including M.C., Aliyah, Gianna, Kimberly, Paris, and Jada, on Instagram, and offered them a business opportunity to appear in a photo shoot or music video. Walker testified that he met Desiree and Jamie at music concerts, met Dalia at a party, and knew Isabel through his best friend, Jordan. Walker admitted that he engaged in sexual activity with each of the accusers, but testified that all of the encounters were consensual. As to the accusers who were minors at the time of the sexual activity, Walker admitted that Gianna told him she was 16 years old, but denied knowing the ages of M.C. or Aliyah.

Walker testified that he was arrested in September 2018, and then rearrested in February 2019 while he was out on bail. He stated that, following his first arrest, he searched online for pornographic videos related to rape because he wanted to understand the sexual offenses that he was accused of committing. Walker admitted, however, that he conducted some of the searches prior to his first arrest. He also testified that he

lied to some of the accusers to impress them, and that he believed this led them to make false accusations against him. Walker stated: "I feel like my personal opinion, the reason why they are all accusing me, I did some childish stuff. I lied. I said the dumbest things to get them to sleep with me. I said whatever possible to be able to look cool and sleep with these girls, and when I made them false promises and said I would do all of this stuff for them, I didn't do any of it. And looking back, now that I'm in a committed relationship—I've been with my fiancée for three years—I realize that I was stupid."

The defense also introduced evidence of statements made by some of the accusers during their interviews with the police. In her interview, Paris indicated that she removed her clothes at Walker's request and voluntarily lay down on his mattress, and that she was not physically restrained by Walker but rather felt powerless. Desiree stated that she was unsure if there was any penetration during the assault. Kimberly acknowledged that she initially did not want to press charges and changed her mind after she contacted Walker. Aliyah told the police that she agreed to have sex with Walker because she thought it could help her career. M.C. stated that she believed she told Walker her age, but she was not certain.

4. **Jury verdict and sentencing**

The jury found Walker guilty of the forcible rape of M.C. (count 1), unlawful sexual intercourse with minor Aliyah (count 2), unlawful sexual intercourse with minor Gianna (count 10), forcible rape and rape while the victim was intoxicated of Kimberly (counts 11 & 23), forcible rape of Paris (count 15), assault with intent to commit oral copulation of Isabel (count 24), and rape while the victim was intoxicated of Desiree

16

(count 25). As to counts 1, 11, and 15, the jury also found true the allegation that Walker committed crimes against multiple victims. The jury found Walker not guilty of three of the charged counts, and the trial court dismissed two other counts because the named victims elected not to testify.

In a bifurcated proceeding, the trial court found true the aggravating factor allegations that certain victims were particularly vulnerable, and that certain offenses indicated planning, sophistication, or professionalism, and included threats, intimidation, or false imprisonment. The trial court sentenced Walker to an aggregate term of 45 years to life plus five years in state prison.

Walker filed a timely appeal.

## DISCUSSION

### 1. Objection to peremptory challenge

Walker contends the trial court erred when it overruled his objection under Code of Civil Procedure section 231.7 to the prosecution's use of a peremptory challenge to excuse an African American prospective juror ("Juror No. 96"). Walker also claims the error deprived him of his federal and state constitutional rights to an impartial jury. We conclude the trial court did not violate Code of Civil Procedure section 231.7 or Walker's constitutional rights in overruling the objection.

#### 1.1. Relevant Background

In her jury questionnaire, Juror No. 96 indicated that she was a registered nurse and married, and had no prior knowledge of the case. When asked about her ability to decide the facts of the case, Juror No. 96 appeared to respond that "[t]he facts of the case should be based on evidence," and that her "feelings may be skewed or influenced to make a decision." When asked if she

17

held any views concerning African Americans such that she could not be a fair and impartial juror in this case, Juror No. 96 replied "Yes," and then explained, "Because African Americans [are] alway[s] marginalized, and most times unfair[ly] treated in our judicial system."

During voir dire, the trial court asked Juror No. 96 about the statement in her questionnaire that African Americans are marginalized and unfairly treated in the judicial system, and whether she could be fair to both sides and base her decision in the case solely on the evidence presented in court. Juror No. 96 replied: "The reason I mentioned that, I know it's a rape case. I think just from facts is the facts are convincible to me, I would— accepting facts. But at the same time from, from what I have been seeing, my experience with jurors, I feel especially the African American has been facing this for a long time. I don't know if I would be able to just base it on facts because I know the judicial system, the way they have been treated from Black Lives Matter, I think it has a big influence. So I don't know if I would be able to overlook that as a juror. So that's why I wrote that and I hope it's not offensive to anyone here." The court noted that "[w]hat we really need to know is whether you can be fair to both sides." In response, Juror No. 96 stated, "Yes, I can. Yes."

The prosecutor asked Juror No. 96 to clarify her statement that she could not base her decision solely on the facts because of her belief that Black males have been unfairly treated by the justice system. Juror No. 96 replied, "Well, I'll base it on the facts but also my opinion and bias remains, but I'll base the judgment on the facts." When asked by the prosecutor whether "that bias [is] going to seep into [her] decision-making process," Juror No. 96 answered: "I hope it wouldn't. But at the same

time, it's better to hear from the witnesses so that way I can be convinced by the witnesses, and if I feel that there is facts and my bias can be waived, so that's the way I feel." The prosecutor also sought clarification on Juror No. 96's statement that her feelings may be skewed or influenced to make a decision. Juror No. 96 stated: "I don't know how to explain it. To me, my—the facts is what matters to me, the evidence would matter to me. But at the same time, if I have any doubts or any feeling of not believing all the facts, that would influence my decision." In response to further questioning, Juror No. 96 confirmed that she was more skeptical of evidence that would come from the government, that she trusted the prosecution less than the defense "depending on the case," and that she would start this case from a position of not trusting the prosecution. Juror No. 96 also indicated that she had a financial hardship because her husband was leaving his job.

Defense counsel asked Juror No. 96 if she could be fair to both sides after hearing the facts of the case. She responded, "Yes." The prosecutor then asked Juror No. 96 to clarify that response given her prior comments about not trusting the prosecution and the government. Juror No. 96 explained that she did not mistrust every person in the government or believe every case in the judicial system was unfair, but rather she was basing her opinion on her "experiences in the U.S." and the "facts that [B]lack people haven't been treated fairly in some cases." Juror No. 96 added, "I can base my decision on facts. But at the same time, I still have that opinion."

The prosecutor challenged Juror No. 96 for cause, arguing that "she specifically said that she doesn't trust the Government, she's skeptical of the Government, and she does not trust or is

skeptical of evidence that comes from the prosecution side." The prosecutor further argued that Juror No. 96 stated in her questionnaire that she felt that Black males were treated unfairly in the justice system, and that she "didn't waiver from that" position during voir dire. The trial court noted that Juror No. 96 did make those statements, but "she later said she could be fair to both sides." The court also acknowledged that "[t]here was some hesitation" in her demeanor in answering voir dire questions, but found that it did not justify a challenge for cause. The court stated, "[G]iven the totality of what she said and the way she acted, it might support a [peremptory], but I'm not going to grant the for cause request at this point."

The prosecutor later exercised a peremptory challenge to excuse Juror No. 96. Defense counsel objected under Code of Civil Procedure section 231.7, arguing that Juror No. 96 was African American and that "there is a class of discrimination." In explaining the reasons for excusing Juror No. 96, the prosecutor stated: "She made statements that she believes the justice system was unfair to [B]lacks. She believes that [B]lacks are marginalized. She thinks [B]lack males are treated unfairly. She's more skeptical of evidence that comes from the Government. She doesn't trust the People or the Government. She can't base her decision—I remember her saying it's not going to be fact-based, that what she knows about the criminal justice system is going to come into play. She actually stated that she didn't think or she wasn't sure she could overlook any of that. And I asked her several questions with respect to that, and she waffled back and forth, but our main issue is that she really does believe that the Government—evidence that comes from the Government or from the People, who we are, can't be trusted.

20

Additionally, she indicated after we talked to her last time about her financial hardships, and again, she brought that up today." The prosecutor added that the Juror No. 96 also expressed that "her opinion on bias will remain, and that essentially indicates that she cannot be fair to the People or the evidence that the People intend on presenting." The prosecutor further noted that the current panel included three Black female jurors.

The trial court overruled the objection, stating: "I'm just noting that not all the reasons that you stated are presumptively invalid, but to the extent the juror did express a lack of trust in law enforcement, I think that could be considered a presumptive [invalid] reason. However, I do agree that the reasons that you've given as a whole provide, in the Court's view, clear and convincing evidence that an objectively reasonable person would view your reasons for excusing this juror as not related to the juror's membership in the group, both being [B]lack or female, and based on that, and that's either a membership in the group or perceived membership in the group. [¶] So I do think it's highly probable that overall your reasons are unrelated to conscious or unconscious bias[,] [are] specific to the juror and do bear on that juror's ability to be fair and impartial." The court also agreed with the prosecutor's assertion that "the People have passed now on three separate [B]lack jurors who obviously are not similarly situated to this person and the reasons that are provided to this person."

The impaneled jury consisted of three Black females, two Asian females, one Indian or Pakistani male, one Hispanic male, three White males, and one White female. Walker is Black, four or five of the victims are Black, and one of the prosecutors in the case is Black.

21

### 1.2. Governing law

Both state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on race. (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).) "A three-step inquiry governs the analysis of *Batson/Wheeler* claims. 'First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 433.)

Effective January 1, 2022, the Legislature enacted Code of Civil Procedure section 231.7 "to establish 'a new process for identifying unlawful bias in the use of peremptory challenges during jury selection' because studies showed that the existing *Batson/Wheeler* analysis . . . was inadequate to prevent racial discrimination." (*People v. Jimenez* (2024) 99 Cal.App.5th 534, 539–540.) The statute prohibits the exercise of peremptory challenges "to remove a prospective juror on the basis of . . . race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership . . . in any of those groups." (Code Civ. Proc., § 231.7, subd. (a).) If either a party or the trial court objects to the use of a peremptory challenge, "the party exercising the peremptory challenge shall state the reasons [it] has been exercised." (*Id.*, subd. (c).) The trial court then "evaluate[s] the reasons given to justify the peremptory challenge in light of the totality of the circumstances. The court shall consider only the reasons actually given and shall

22

not speculate on, or assume the existence of, other possible justifications. . . ." (*Id.*, subd. (d)(1).) If the court determines "there is a substantial likelihood that an objectively reasonable person would view" the prospective juror's membership in a cognizable group "as a factor in the use of the peremptory challenge, then the objection shall be sustained." (*Ibid.*)

An "objectively reasonable person" is defined as one who "is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California." (Code Civ. Proc., § 231.7, subd. (d)(2)(A).) " '[S]ubstantial likelihood' means more than a mere possibility but less than a standard of more likely than not." (*Id.*, subd. (d)(2)(B).) The statute also sets forth a nonexhaustive list of circumstances the court may consider in making its determination. (*Id.*, subd. (d)(3).)

Subdivision (e) of the statute provides that certain reasons given for the use of a peremptory challenge are "presumed to be invalid unless the party exercising the peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's" membership in the cognizable group, and "that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." (Code Civ. Proc., § 231.7, subd. (e).) These presumptively invalid reasons include "[e]xpressing a distrust of or having a negative experience with law enforcement or the criminal legal system," and "[e]xpressing a belief that law enforcement officers engage in racial profiling or that criminal laws have been enforced in a discriminatory manner." (*Id.*, subd. (e)(1)–(2).) Clear and convincing evidence to overcome the presumption exists when the court, "bearing in

mind conscious and unconscious bias," determines "that it is highly probable that the reasons given for the exercise of a peremptory challenge are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on that juror's ability to be fair and impartial in the case." (*Id.*, subd. (f).)

We review de novo the trial court's overruling of an objection under Code of Civil Procedure section 231.7, "with the trial court's express factual findings reviewed for substantial evidence." (*Id.*, subd. (j).) In applying this standard of review, we do not impute to the trial court any factual findings that it did not expressly state on the record. (*Ibid.*) Moreover, we consider only those reasons actually given by the party exercising the peremptory challenge, and we may not speculate as to reasons that were not given. (*Ibid.*) If we conclude the trial court erred in overruling the objection, "that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (*Ibid.*)

### 1.3. The trial court did not err in overruling the objection to the prosecution's use of a peremptory challenge to excuse Juror No. 96

Walker argues the prosecution improperly exercised a peremptory challenge based on Juror No. 96's race in violation of Code of Civil Procedure section 231.7. The record reflects the prosecution's stated reasons for excusing Juror No. 96 included that (1) she "believes the justice system was unfair to [B]lacks" and "[B]lack males are treated unfairly," and (2) she is "more skeptical of evidence that comes from the Government" and "doesn't trust the People or the Government." As the People concede, these reasons were presumptively invalid under the statute because they expressed a "distrust of . . . the criminal

24

legal system" and a "belief . . . that criminal laws have been enforced in a discriminatory manner." (*Id.*, subd. (e)(1)–(2).) Therefore, we must consider whether the prosecution overcame that presumption by clear and convincing evidence. (*Id.*, subd. (e).) That is, we must determine whether "it is highly probable that the reasons given for the exercise of [the] peremptory challenge are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on that juror's ability to be fair and impartial in the case." (*Id.*, subd. (f).) We conclude the People made the requisite showing in this case.

Juror No. 96 repeatedly acknowledged in both her jury questionnaire and voir dire responses that she would have difficulty setting aside her beliefs about the unfair treatment of African Americans in the judicial system and her distrust of the government and the prosecution. She also was equivocal in her statements about whether she could decide the case based solely on the evidence presented at trial. When asked by both the trial court and defense counsel if she could be fair to both sides, Juror No. 96 answered "Yes." However, when asked specifically how her beliefs about the unfair treatment of African Americans might affect her ability to judge the case, she stated, "I don't know if I would be able to just base it on facts because I know the judicial system," and "I don't know if I would be able to overlook that as a juror." When asked to elaborate on these remarks, Juror No. 96 again equivocated, stating, "I'll base it on the facts but also my opinion and bias remains." In response to further questioning, she also admitted she would be more skeptical of evidence presented by the government and would start the trial from a position of not trusting the prosecution. Even after extensive voir dire, Juror No. 96 remained noncommittal about

25

her ability to set aside her personal feelings about the criminal justice system and serve as a fair and impartial juror. Indeed, at the conclusion of her voir dire, she stated, "I can base my decision on the facts. But at the same time, I still have that opinion."

On this record, the trial court properly found that it was highly probable that the prosecution's stated reasons for excusing Juror No. 96 were unrelated to bias, and were instead specific to that juror and bore on her ability to be fair and impartial in this case. As a result, the trial court did not err in determining that the prosecution overcame the presumption of invalidity under Code of Civil Procedure section 231.7 by clear and convincing evidence. (See *People v. Gonzalez* (2024) 104 Cal.App.5th 1, 17 [presumptive invalidity overcome where prospective juror "expressed frustration with law enforcement's handling of his cousin's murder case, and doubt as to whether he could keep that experience from influencing his decisions as a juror"]; *People v. Jimenez, supra*, 99 Cal.App.5th at p. 544 [presumptive invalidity overcome given prospective juror's "repeated acknowledgement that she would have difficulty setting aside her bias against law enforcement officers to fairly consider their testimony, despite her initial statements she could be fair"].)

We further conclude that, based on the totality of the circumstances, there is not a substantial likelihood that an objectively reasonable person would view Juror No. 96's race as a factor in the prosecution's use of a peremptory challenge against her. While Juror No. 96 is the same race as Walker, who is African American, she also is the same race as four or five of the victims and one of the prosecutors in the case. Moreover, as the trial court recognized, the prosecution did not exercise peremptory challenges against three other prospective Black

26

jurors, and twice accepted them as part of the panel prior to excusing Juror No. 96. The impaneled jury ultimately included three Black female jurors. The record also reflects that, before exercising the peremptory challenge, the prosecution thoroughly questioned Juror No. 96 regarding her beliefs about the unfair treatment of African Americans in the judicial system and her lack of trust in the government. The prosecution's stated reasons for excusing Juror No. 96 based on her inability to be fair and impartial in this case were well-supported by the record.

In challenging the trial court's ruling, Walker asserts the court only gave conclusory reasons for overruling his objection to the peremptory challenge. We disagree. After hearing the prosecution's reasons for excusing Juror No. 96, the court noted that the lack of trust in law enforcement was a presumptively invalid reason for the peremptory challenge. The court then found that the reasons articulated by the prosecutor as a whole provided "clear and convincing evidence that an objectively reasonable person would view [the] reasons . . . as not related to the juror's" race or gender, and that it was "highly probable that overall [the] reasons are unrelated to conscious or unconscious bias" and instead are "specific to the juror and do bear on that juror's ability to be fair and impartial." The court also found that the prosecution did not exercise peremptory challenges on three other Black female jurors. The court thus applied the correct standard of proof and determined that the prosecution's stated reasons for excusing Juror No. 96 met that standard under Code of Civil Procedure section 231.7.

Walker also claims the trial court's ruling was inconsistent with the factual findings it made in denying the prosecution's for-cause challenge to Juror No. 96. This claim likewise lacks merit.

27

In ruling on the challenge for cause, the trial court noted that Juror No. 96 "said she could be fair to both sides." Based on that statement, the court declined to dismiss the juror for cause. However, the court also made clear that the totality of Juror No. 96's statements and demeanor during voir dire "might support a peremptory" challenge. The denial of the for-cause challenge earlier in the case did not preclude the trial court from later determining that, based on the totality of those circumstances, the prosecution's use of a peremptory challenge to excuse the juror did not violate Code of Civil Procedure section 231.7. As the People correctly point out, the statute "applies only to peremptory challenges, not challenges for cause." (*People v. Aranda* (2023) 95 Cal.App.5th 311, 313.) Considering the entire record, an objectively reasonable person would determine that the prosecution exercised the peremptory challenge because of Juror No. 96's inability to be fair and impartial in this case. The trial court accordingly did not err in overruling Walker's objection under Code of Civil Procedure section 231.7.

Walker contends the prosecution's use of a peremptory challenge against Juror No. 96 also violated his federal and state constitutional rights. However, under the three-step *Baston/Wheeler* framework," '[t]here "is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." ' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 766.) The first step requires the defendant to " 'make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." ' " (*Ibid.*) In his opening brief, Walker does not argue that he made a prima facie

showing of race discrimination in the prosecution's exercise of its peremptory challenge. Rather, he merely asserts that because "the prosecution's justification for the excusal of . . . Juror No. 96 was not race-neutral, for the same reasons given above in the section 231.7 analysis, reversal is required." This is insufficient to establish a prima facie case under *Batson*/*Wheeler*. Furthermore, given our conclusion that an objectively reasonable person would not view race as a factor in the prosecution's use of a peremptory challenge against Juror No. 96, "it necessarily follows that the evidence was insufficient to permit the trial judge to draw an inference that discrimination has occurred." (*People v. Jimenez, supra*, 99 Cal.App.5th at p. 548.) The trial court's ruling on the peremptory challenge therefore did not violate Walker's constitutional rights.

## 2. Admission of evidence of Walker's online search history

Walker argues the trial court abused its discretion in admitting evidence of his online search history of pornography because it constituted improper character evidence, was irrelevant, and was unduly prejudicial. Walker also asserts the admission of this evidence violated his constitutional rights to due process and free speech. We find no abuse of discretion or constitutional violation in the admission of the evidence.

### 2.1. Relevant background

During trial, the prosecution sought to introduce evidence of 15 search terms that Walker used while visiting a certain pornographic website. Defense counsel objected on the grounds that it was improper character evidence and that the prejudicial effect of its admission outweighed any probative value. The prosecution argued that because Walker searched for

29

pornography that depicted the same type of sexual offenses at issue in the case, the evidence was probative of his state of mind, was not character evidence, and was not unduly prejudicial.

After taking the matter under submission, the trial court ruled that a portion of the online search history was admissible. The court concluded that Walker's online searches concerning rape, exploited girls, and fake photo shoots were "relevant circumstantial evidence of a defendant's specific sexual desires, in this case regarding rape and exploiting young women as a photographer, and by extension the actions by which he might gratify those sexual desires." The court further concluded that the evidence was not unduly prejudicial because the jury would not be shown the actual pornographic videos, the activity itself was not illegal, and the searches were not remote in time relative to the charged offenses. The court also indicated that it would give an appropriate limiting instruction to the jury.

The trial court later instructed the jury with CALCRIM No. 375, which provided in relevant part: "The People presented evidence that the defendant's cellphone contained certain internet searches relating to a pornographic website. If you decide that the defendant conducted those searches, you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] The defendant acted with the intent required to commit the offenses charged in this case; or [¶] The defendant had a motive to commit the offenses charged in this case. [¶] Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."

### 2.2.  Governing law

The rules governing the admissibility of evidence are well-established.  Only relevant evidence is admissible.  (Evid. Code, § 350.)  Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id.*, § 210.)  Evidence is relevant when it " ' "tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' "  (*People v. Young* (2019) 7 Cal.5th 905, 931.)  The trial court, however, may exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  Evidence is unduly prejudicial when it " 'tends to evoke an emotional bias against the defendant as an individual,' " while having only slight probative value with regard to the issues.  (*People v. Miles* (2020) 9 Cal.5th 513, 587.)

Under Evidence Code section 1101, "evidence of a character trait is not admissible to demonstrate conduct on a particular occasion, but such evidence is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.' (Evid. Code, § 1101, subd. (b).)"  (*People v. Parker* (2022) 13 Cal.5th 1, 38–39.)  When reviewing the admission of uncharged misconduct evidence to show motive or intent, " ' " 'a court must consider:  (1) the materiality of the fact to be proved or disproved, (2) the probative

31

value of the . . . evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant.' " ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 358.)  To be admissible, " 'the uncharged misconduct must be sufficiently similar to the charged offense to support the inference that the defendant probably acted with the same intent in each instance.' " (*People v. Scott* (2015) 61 Cal.4th 363, 398.)

" 'We review the trial court's rulings on relevance and the admission of evidence under Evidence Code sections 352 and 1101 for abuse of discretion.' " (*People v. Parker*, *supra*, 13 Cal.5th at p. 39.)  "We do not disturb the trial court's ruling unless it was arbitrary, capricious, or made in a ' "patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Thomas*, *supra*, 14 Cal.5th at p. 358.)

### 2.3. The trial court did not err in admitting the evidence of Walker's online search history

Walker contends the trial court should have excluded the evidence of his online search history of pornography because it was inadmissible character evidence under Evidence Code section 1101, was irrelevant under Evidence Code section 350, and was more prejudicial than probative under Evidence Code section 352.  Walker claims the prosecution failed to prove his online searches reflected a motive or intent to actualize any of the fantasies that were depicted in the pornography.  This claim lacks merit.

Our Supreme Court has recognized that evidence of sexually explicit images possessed by a defendant may be relevant to proving motive or intent in prosecutions involving sexual offenses.  (See *People v. Parker*, *supra*, 13 Cal.5th at p. 39; *People v. Clark* (1992) 3 Cal.4th 41, 129; *People v. Memro* (1995)

32

11 Cal.4th 786, 864.)  In *People v. Memro*, for instance, the defendant was charged with felony murder based on a killing during the commission of a lewd act with a child.  (*People v. Memro*, at p. 862.)  The trial court admitted certain magazines and photographs that were found in the defendant's possession and depicted male youths in sexually graphic poses.  (*Id.* at pp. 864–865.)  The Supreme Court held that the trial court did not err in admitting this material under Evidence Code section 1101 because "the photographs, presented in the context of defendant's possession of them, yielded evidence from which the jury could infer that he had a sexual attraction to young boys and intended to act on that attraction."  (*People v. Memro*, at p. 865.)  The Supreme Court also concluded that, while the evidence "would undoubtedly be disturbing to most people," it was not substantially more prejudicial than probative, "for its value in establishing defendant's intent . . . was substantial."  (*Ibid.*; see also *People v. Parker*, at p. 39 [trial court did not err in admitting sexually explicit images found in defendant's possession because a jury could infer he "intended to engage in specific sexual acts with [the victim] based upon the images he possessed"]; *People v. Clark*, at p. 129 [trial court did not err in admitting pictures from a pornographic book found in defendant's home because it "was probative of defendant's interest in that matter"].)

In this case, the trial court reasonably concluded that Walker's online search history was admissible under Evidence Code section 1101 because it was relevant to proving his intent to commit the charged crimes.  "A plea of not guilty puts in issue every material allegation of the accusatory pleading—including the intent with which [the defendant] engaged in the charged

33

conduct." (*People v. Ranlet* (2016) 1 Cal.App.5th 363, 375; see *People v. Chhoun* (2021) 11 Cal.5th 1, 29.) Walker placed his intent at issue by pleading not guilty to the sexual offenses charged. The prosecution sought to prove Walker's guilt by showing that he targeted young women and girls primarily on Instagram, deceived them into believing they were attending a professional photo shoot, and then sexually assaulted them after luring them to his apartment. The pornographic material that Walker searched for online shared significant similarities with the victims' accounts of the sexual assaults. Walker specifically searched a pornography website for the titles "raped" or "rape," "fucking this girl from Instagram," "tricked into f'g," "exploited girl talked into sex with pervert photographer," "begged not to rape," and "fake photo shoot." Based on these online searches, the jury could infer that Walker intended to rape the women and girls that he tricked into meeting him under the false pretense of a photo shoot.

The trial court also reasonably concluded that the evidence of Walker's online search history was not unduly prejudicial under Evidence Code section 352. The court did not admit the entirety of the search history proffered by the prosecution, and instead limited the evidence to searches that related to the types of sexual acts at issue in this case. Further, as the trial court noted, the actual pornography was not shown to the jury. Rather, the evidence was confined to testimony and data extraction reports from a law enforcement officer who relayed the search terms that were entered on specific dates when Walker's device visited a certain pornographic website. As a result, the evidence did not consume an undue amount of time, nor did its admission create a risk of confusing the issues or misleading

34

the jury. While the jury may have found Walker's interest in pornographic depictions of rape to be disturbing, the evidence of his online activity was no more inflammatory than the testimony of the victims who described in detail the circumstances of the sexual assaults against them. Moreover, the trial court gave a limiting instruction that directed the jury not to consider the evidence of Walker's internet searches for an improper purpose. We presume the jury followed the instruction. (*People v. Chhoun*, *supra*, 11 Cal.5th at p. 30.) Under these circumstances, the trial court did not abuse its discretion in admitting the evidence.

We likewise reject Walker's claims that the admission of the evidence violated his constitutional rights to due process and freedom of speech. The " '[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a [defendant's] constitutional rights.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.) For instance, " '[t]he admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*People v. Jones* (2013) 57 Cal.4th 899, 949.) Here, the trial court reasonably found that Walker's online search history was relevant to the charged offenses and not unduly prejudicial. Thus, there was no due process violation. The admission of the evidence also did not violate Walker's right to free speech. As the Supreme Court has explained, the admission of pornographic materials possessed by a defendant does not violate the First Amendment because the "defendant is not being punished for his possession of the materials, and he cannot shelter under a free speech privilege when the sexually graphic material was relevant to the charged offenses." (*People v. Parker*, *supra*, 13 Cal.5th at p. 38.) Walker's constitutional claims therefore fail.

35

3.    **Exclusion of proffered impeachment evidence regarding Aliyah**

Walker challenges the trial court's ruling denying his request to call Aliyah's friend, Camille, as an impeachment witness. He contends the proffered testimony that Aliyah told Camille that she had consensual sex with Walker was admissible to impeach Aliyah as a prior consistent or inconsistent statement. He also claims the exclusion of the evidence violated the "Right to Truth-in-Evidence" provision in the California Constitution and deprived him of his constitutional rights to due process and to present a defense. We find no error in the trial court's ruling.

**3.1.   Relevant background**

In count 2, Walker was charged with unlawful sexual intercourse with a minor, Aliyah. Following Aliyah's trial testimony, the defense sought to call Camille, the friend who accompanied Aliyah to her photo shoot with Walker, as a witness. Defense counsel explained that Camille would testify that, after Aliyah came back from Walker's apartment, she told Camille that she had sex with Walker and that she did so to help her career. Defense counsel argued that the proffered testimony "directly impeaches Aliyah" because "Aliyah testified she was raped." In opposing the request, the prosecution asserted that Aliyah's statement to Camille that she had sex with Walker was not inconsistent with her trial testimony because Aliyah did not testify that she was raped, but rather that she consented to sex with Walker after he pressured her. The prosecution also argued that the rest of Aliyah's statement to Camile was not relevant because Aliyah admitted in her trial testimony that she told the police that she had sex with Walker to help her career, and

36

Detective Widman would be testifying to that effect when called as a witness.

The trial court denied Walker's request to call Camille as an impeachment witness. The court concluded that the proffered testimony was not relevant to any disputed issue because Aliyah repeatedly testified that she had consensual sex with Walker, and in any event, consent was not an element of the charged offense involving Aliyah. The court noted that Aliyah's statement that she had sex with Walker to help her career was marginally relevant to her credibility, but was subject to exclusion under Evidence Code section 352 because Detective Widman would be testifying that Aliyah made this statement to her during a police interview.

### 3.2. Governing law

Evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated is hearsay and is generally inadmissible. (Evid. Code, § 1200.) A prior statement that is inconsistent with a witness's trial testimony is admissible as an exception to the hearsay rule provided that the witness had an opportunity to explain or to deny the statement while testifying or has not been excused from giving further testimony. (Evid. Code, §§ 1235, 770, subd. (a).) A prior statement that is consistent with a witness's trial testimony also is admissible as a hearsay exception if it predates an inconsistent statement used to impeach the witness's testimony, or the witness's testimony has been challenged as recently fabricated or influenced by an improper motive. (Evid. Code, §§ 1236, 791, subd. (b).)

" 'The proponent of proffered testimony has the burden of establishing its relevance, and if the testimony is comprised of

37

hearsay, the foundational requirements for its admissibility under an exception to the hearsay rule. [Citations.] Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence.' " (*People v. Mataele* (2022) 13 Cal.5th 372, 413.) " ' "As with all relevant evidence, . . . the trial court retains discretion to admit or exclude evidence offered for impeachment." ' " (*People v. Case* (2018) 5 Cal.5th 1, 46.) "A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

### 3.3. The trial court did not err in excluding the proffered evidence regarding consensual sex with Aliyah

Walker argues that Camille's testimony that Aliyah told her that she had consensual sex with Walker should have been admitted as impeachment evidence. He contends that, to the extent Aliyah testified that the sex was nonconsensual, Camille's testimony was admissible as a prior inconsistent statement. Alternatively, he claims that, to the extent Aliyah testified that the sex was consensual, Camille's testimony was admissible as a prior consistent statement because Aliyah's statement to Camille about consensual sex predated other out-of-court statements that she made about nonconsensual sex. We conclude the trial court acted well within its discretion in excluding the evidence.

As the trial court observed, the proffered testimony of Camille was not relevant to any disputed issue at trial. Walker was not charged with the forcible rape of Aliyah. Rather, he was

38

charged in this count with having unlawful sexual intercourse with a minor more than three years younger in violation of section 261.5, subdivision (c). Because consent was not an element of the offense involving Aliyah, the court reasonably could find that Aliyah's statement to Camille about having consensual sex with Walker had no "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Moreover, Aliyah's prior statement to Camille was not inconsistent with her trial testimony. Aliyah testified at trial that Walker did not use any force, fear, or threats against her, and that although she felt "coerced," she ultimately agreed to have sex with him. Aliyah also testified that she told Camille that she had sex with Walker as soon as she came back from his apartment, and that she did not feel sad or upset at that time. As the trial court noted, "[T]he point was made many times during Aliyah's testimony that it was consensual."

Walker's alternative claim that the proffered testimony was admissible as a prior consistent statement also fails. He asserts that Aliyah's statement to Camille that she had consensual sex with Walker preceded inconsistent statements that she made to a Planned Parenthood nurse and Detective Widman that the sex was not consensual. The record reflects, however, that Aliyah's statements on the matter were more nuanced. Aliyah testified that, when she visited a Planned Parenthood clinic, the nurse asked a series of questions about her sexual history, including whether she ever had nonconsensual sex. Aliyah explained that she answered "yes" to that question because she felt "coerced" and "pressured" to "give in" to having sex with Walker, even though no force or fear was used. Aliyah further admitted that,

39

during an interview with Detective Widman, she said that she agreed to have sex with Walker because she thought it would help her succeed in the modeling industry. In her trial testimony, Detective Widman recalled that Aliyah struggled to clearly articulate why she had sex with Walker. Aliyah told the detective that she felt "pressured" and "coerced," but she also said that she ultimately agreed to have sex with Walker because she thought "it could help promote her career." When considered in their full context, Aliyah's prior statements on the issue of consent were not inconsistent with her trial testimony. The trial court therefore did not err in excluding this evidence.

Walker claims that the exclusion of the proffered evidence violated the California Constitution's "Right-to-Truth-in-Evidence" provision, which states that "relevant evidence shall not be excluded in any criminal proceeding." (Cal. Const., art I, § 28, subd. (f)(2).) Because the trial court properly found that the evidence was not relevant to the charged offenses, this claim lacks merit. Walker also asserts that the exclusion of the evidence violated his constitutional rights to due process and to present a complete defense. However, "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Johnson* (2022) 12 Cal.5th 544, 607.) While " 'a criminal defendant has a constitutional right to present all relevant evidence of *significant* probative value in [his] favor [citations], " . . . the proffered evidence must have more than 'slight-relevancy' to the issues presented." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 865.) Here, the trial court reasonably determined that Aliyah's prior statement to Camille was not relevant to the issues being tried and was not admissible for impeachment purposes. On this

40

record, the trial court did not abuse its discretion or violate Walker's constitutional rights in excluding the evidence.

## 4. Exclusion of proffered character evidence regarding Walker's sexual activity with other women

Walker next contends the trial court erred in precluding him from calling Camille and his fiancée, Hannah Rossignol, to testify as character witnesses. He argues the testimony of these witnesses was admissible as evidence of his good character under Evidence Code section 1102 because they each would testify that they engaged in an act of consensual sex with him. Walker also asserts the exclusion of this evidence violated the California Constitution's "Right-to-Truth-in-Evidence" provision, as well as his federal and state constitutional rights to due process and to present a defense. We conclude the trial court did not err in excluding the proffered testimony.

### 4.1. Relevant background

In addition to calling Camille as a witness to impeach Aliyah's testimony, the defense sought to present evidence that, on the same night that Aliyah had sex with Walker, Camille also had consensual sex with him. Defense counsel explained that he anticipated that Camille would testify that Walker raped her, and that he would then impeach Camille with a video recording of the encounter showing that her sexual activity with Walker was consensual. The prosecution objected, arguing that Camille was not named as a victim in the counts being tried to the jury, so the evidence that she had consensual sex with Walker was not relevant to the charged offenses and was unduly prejudicial under Evidence Code section 352.

The trial court ruled that the proffered testimony regarding Camille was inadmissible. The court stated: "Camille is not

41

relevant. There is nothing relevant that . . . [¶] would survive a 352 analysis of bringing in someone who is not charged [as a victim] to say that they had consensual sex with the Defendant." When defense counsel noted that he expected Camille would deny that she had consensual sex with Walker, the court added: "All you're bringing in Camille for is to show the jury that she's lying. And she's not charged in the case; so it has nothing to do with the other victims."

The defense later sought to call Rossignol, Walker's fiancée, to testify that she met Walker under similar circumstances as the alleged victims and that they had consensual sex. The prosecution argued that evidence of consensual sex between Walker and his fiancée was not relevant, asserting: "So if they are presenting character evidence and they are trying to do that in order to rebut an [Evidence Code section 1108] situation and say that he's not a rapist, that's one thing. But to say, 'He lied to me, I had sex with him. . . .' So talking about whether he has consensual sex has no relevance in this case." In response, defense counsel asserted that Rossignol's testimony was "not character evidence" because he was "not going to ask her, 'what is . . . his reputation? What do you think about him?'" Instead, the defense intended to use Rossignol's testimony "to show that there is similar conduct as to how they met and what they did when they first met and what Mr. Walker said to her, which is very similar to what we've heard the alleged victims say, but with clearly a different result."

The trial court denied Walker's request to call Rossignol as a witness, ruling: "My view is . . . that there [are] circumstances that have no relevance to these victims that are alleged in this case. [¶] You know, if the only purpose of her testimony is to

testify as to how they met, their specific circumstances, and even if there is some similarity in how they met with how [Walker] met some of the victims, it[] still in my view would not be relevant. [¶] . . . [¶] . . . [T]he thing is, even if they met under similar circumstances to some of the victims, he didn't rape her . . . . If it's not [Evidence Code section] 1108 evidence, it's not relevant—it has no specific relevance to this case."

### 4.2. Governing law

Evidence Code section 1101, subdivision (a), sets forth the general rule that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (*Ibid*.) One exception to this general rule is contained in Evidence Code section 1102. It provides, in relevant part, that "evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is: [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character." (*Ibid*.)

This exception to the general bar on character evidence "allows a criminal defendant to introduce evidence, either by opinion or reputation, of his character or a trait of his character that is 'relevant to the charge made against him.' [Citations.] Such evidence is relevant if it is inconsistent with the offense charged . . . and hence may support an inference that the defendant is unlikely to have committed the offense." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1305 (*McAlpin*).) While evidence of the defendant's character, in the form of an opinion or evidence of his reputation, is permitted under Evidence Code section 1102,

43

specific instances of the defendant's conduct are not admissible. (*McAlpin*, at p. 1309–1310.) Moreover, even where the proffered evidence meets the requirements of Evidence Code section 1102, the trial court retains the discretion to exclude it under Evidence Code section 352. (*McAlpin*, at p. 1310, fn. 15.) We review the trial court's rulings on the admissibility of character evidence under Evidence Code sections 352, 1101, and 1102 for abuse of discretion. (*People v. Parker*, *supra*, 13 Cal.5th at p. 39; *People v. Doolin* (2009) 45 Cal.4th 390, 437.)

### 4.3. The trial court did not err in excluding the proffered evidence regarding consensual sex with other women

Citing the Supreme Court's decision in *McAlpin*, Walker argues that the testimony of Camille and Rossignol regarding their consensual sexual encounters with him was relevant and admissible under Evidence Code section 1102. That decision, however, does not support Walker's argument. In *McAlpin*, the defendant was charged with lewd conduct with a child. (*McAlpin*, *supra*, 53 Cal.3d at p. 1294.) At trial, the defendant sought to call several character witnesses, including two women who previously had long-term relationships with him and also had daughters of their own. (*Id*. at p. 1304.) Both women would provide opinion testimony that the defendant was not sexually deviant, and would base their opinion on "(1) their assertedly normal personal sexual experiences with defendant, and (2) their observations of defendant's conduct with their daughters during the period of their relationship." (*Id*. at p. 1305.)

The Supreme Court in *McAlpin* held that, to the extent the women's proffered testimony "was based on their private sexual experiences with defendant rather than on their observation of

44

his behavior with their daughters, the trial court could disallow it . . . ." (*McAlpin*, *supra*, 53 Cal.3d at p. 1309.) However, to the extent the testimony "was based on their direct observation of defendant's behavior with their daughters, it was both a proper subject of lay opinion testimony and relevant to the charge of child molestation." (*Ibid*.) As the Supreme Court further explained: "A fair reading of the offer of proof shows that the women witnesses would not have limited their testimony to specific instances in which defendant had the opportunity to, but did not, molest their daughters. Instead, the witnesses proposed to testify that they observed defendant's behavior with their children throughout the course of their relationship with him, and their opinion that he is not a person given to lewd conduct with children arose from that experience as a whole. Thus viewed, the proffered testimony was intended to prove the relevant character trait not by specific acts of 'nonmolestation,' but by the witnesses' opinion of that trait based on their long-term observation of defendant's course of consistently normal behavior with their children. [Citation.] The trial court should have allowed such testimony." (*Id*. at pp. 1309–1310.)

In this case, however, Walker did not propose calling either Camille or Rossignol to testify about their personal observations of his behavior over the course of their relationships with him. Rather, he sought to elicit testimony from each woman about the specific occasion when she first met Walker and had consensual sex with him. Indeed, there was nothing in Walker's offer of proof for Camille to suggest that she had any interaction with him apart from the one instance of sexual activity that occurred on same date that Walker had sex with Aliyah. Rossignol, on the other hand, was in a long-term relationship with Walker and

45

presumably could offer an opinion about his character based on her direct observations of his conduct during their relationship. However, in describing Rossignol's proposed testimony to the trial court, defense counsel made clear that he did not intend to ask her to provide an opinion about Walker's character. Instead, Rossignol would testify about the first time that she had sex with Walker "to show that there is similar conduct as to how they met and what they did when they first met and what [he] said to her." Accordingly, for both Rossignol and Camille, the proffered testimony concerned a specific instance in which an individual who was not a named victim in the case had consensual sex with Walker in order to prove that he was not the type of person who would have had nonconsensual sex with the named victims. Such evidence was not admissible under Evidence Code section 1102. (*McAlpin*, *supra*, 53 Cal.3d at p. 1309; see also *People v. Felix* (1999) 70 Cal.App.4th 426, 431 [Evidence Code "[s]ection 1102 creates an exception . . . in criminal cases for evidence 'in the form of an opinion or . . . reputation,' but not specific instances of conduct"].)

Here, the trial court reasonably could conclude that the evidence that Camille and Rossignol had consensual sex with Walker on a prior occasion was not relevant to the charged offenses and did not constitute admissible character evidence under Evidence Code section 1102. In the case of Camille, the trial court also reasonably could conclude that the evidence was unduly prejudicial under Evidence Code section 352 given that the defense planned to impeach Camille with a sex video that she made with Walker in the event she denied engaging in an act of consensual intercourse. Under these circumstances, the trial court did not abuse its discretion in excluding the proffered

46

testimony of both women. For these same reasons, the exclusion of the evidence did not violate the California Constitution's "Right-to Truth-in-Evidence" provision, nor did it deprive Walker of his constitutional rights to due process and to present a defense.

## 5. Cumulative error

Walker asserts the cumulative effect of the claimed errors deprived him of due process of law and a fair trial. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant. [Citations.] Although a defendant is entitled to a fair trial, he or she is not entitled to 'a perfect one.'" (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) Here, Walker received a fair trial and has failed to show any cumulative error requiring reversal of his convictions.

## 6. *Pitchess* review

Prior to trial, Walker filed a motion for discovery under *Pitchess*, *supra*, 11 Cal.3d 531, seeking evidence of misconduct by Detective Widman, the lead investigator on the case. The trial court ordered an in camera hearing on the motion. After conducting an in camera review of the requested materials, the trial court found that there were no discoverable records to be disclosed.

On appeal, Walker has requested that we conduct an independent review of the sealed record to determine whether any discoverable material was withheld. We reviewed the sealed record of the proceedings, and conclude the trial court properly exercised its discretion in ruling there was no *Pitchess* material to be disclosed. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.)

47

### 7.     Clerical errors in the abstract of judgment

In supplemental briefing, Walker asks this court to correct certain clerical errors in the abstract of judgment.  Specifically, Walker asserts that the abstract of judgment misidentifies the offense in count 1 as "Forcible rape-child victim over 14 years," the offense in count 2 as "Forcible rape-child over 14," and the offenses in counts 23 and 25 as "Rape by use of drugs."  Walker also asserts that the abstract of judgment for the determinate sentences misidentifies his race as "Hispanic" rather than "Black."  The People do not oppose the corrections to the abstract of judgment requested by Walker, and we agree that these clerical errors should be corrected.

The abstract of judgment accordingly must be modified to list the offense in count 1 as "Forcible rape," the offense in count 2 as "Unlawful sexual intercourse with a minor," and the offenses in counts 23 and 25 as "Rape by use of intoxication." The abstract of judgment for the determinate sentences also must be modified to list Walker's race/national origin as "Black" rather than "Hispanic."

48

## DISPOSITION

The judgment is modified to reflect that the conviction in count 1 is for "Forcible rape," the conviction in count 2 is for "Unlawful sexual intercourse with a minor," and the convictions in counts 23 and 25 are for "Rape by use of intoxication." The judgment is further modified to identify Walker's race/national origin in the abstract of judgment for the determinate sentences as "Black." As modified, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment, and to forward a certified copy to the Department of Corrections and Rehabilitation.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

WILEY, J.

49